UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

LAUREN GARCIMONDE-FISHER,      )
JEFFREY L. HARRIS,             )
JEFFREY L. COLE,               )
                               )
Plaintiffs,                    )
                               )      No. 1:13-CV-422
v.                             )
                               )      Judge Curtis L. Collier
AREA203 MARKETING, LLC.,       )
                               )
Defendant.                     )

## M E M O R A N D U M

Before the Court is Defendant Area203 Marketing's ("Defendant") motion for summary

judgment (Court File No. 36). Plaintiffs Lauren Garcimonde-Fisher ("Plaintiff Garcimonde-

Fisher"), Jeffrey L. Harris (Plaintiff Harris"), and Jeffrey L. Cole ("Plaintiff Cole") (collectively

"Plaintiffs") responded (Court File No. 39) and Defendant replied (Court File No. 40). For the

reasons set forth below, the Court will **GRANT IN PART** and **DENY IN PART** the

Defendant's motion for summary judgment (Court File No. 36).


## I.      FACTUAL BACKGROUND

Defendant Area203 Marketing is a marketing company owned by Carey Brown

("Brown") which was originally formed to provide marketing services for Brown's payday

lending businesses and other affiliated businesses. Prior to November 2009, it was known as

Logic Marketing. Brown is a practitioner of evangelical Protestantism and was, at the time of

these events, a Southern Baptist. James Cole helped Brown run some of his companies and

served a human resources role for the management team of Area203. Ron Beaver was brought

into the Area203 management team as Chief Operating Officer after Plaintiff Cole was terminated.

Brown believed his businesses should reflect his values. The offices of Area203 were saturated with religious, particularly Evangelical Christian, imagery. The walls were decorated with Judeo-Christian artwork and biblical posters, and placards of the Ten Commandments graced rooms throughout the office. Materials with religious messages and solicitations for donations to overtly religious charities were distributed to employees. The break room had a TV that looped Christian movies all day long. Religious charities were invited to give presentations employees were required to attend and allowed to solicit donations from employees. For part of the time Plaintiffs were employed at Area203, Area203 kept a chaplain on staff, R.C. Reynolds, who hosted prayer meetings and bible studies scheduled during work.[1]

R.C. Reynolds' tenure at Area203 is the subject of some controversy. Both parties agree he did tell employees his Bible studies were mandatory, he aggressively promoted his religion in the workplace (e.g. he told employees the King James Version was the "correct" version of the Bible), and he told employees Brown himself had stated attendance was required. But Area203 claims Reynolds was not acting in accord with Brown's wishes and asserts Brown took action against Reynolds; first by sending James Cole to tell him to stop and then—when he refused to do so—removing him from the premises. It is also unclear whether Reynolds was actually on Area203's payroll or whether Area203 merely made donations to Reynolds' charity. Brown does admit he never sent any message to his employees clarifying that the prayer meetings and bible studies were not required.

Brown himself was accused of making derogatory comments regarding faiths other than

---

[1] Defendant disputes that these were mandatory. Reynolds was allegedly expelled for asserting that employees were required to attend.

his particular brand of Christianity. In the presence of Plaintiff Jeff Cole, a Catholic, he stated the King James version of the Bible was the "correct" version of the Bible (Pl. Cole Dep. 199). He also stated that a Catholic was not the "right kind of Christian" to Plaintiff Garcimonde-Fisher, also a Catholic (Garcimonde-Fisher Dep. 225). Brown was openly defiant about the extent to which he brought religion into the workplace. At a February 2010 meeting with employment counsel and several members of Area203's senior management team, in the wake of Plaintiff Jeff Cole's termination and subsequent EEOC complaint, Brown stated those who find the religious materials decorating the walls discriminatory can just quit. Defendant disputes whether these events occurred.

Plaintiffs allege these religious predilections extended to Area203's clients. In September 2008, Plaintiffs Garcimonde-Fisher and Cole met with a client of Area203, Naomi Crain. During the meeting she emphasized her close relationship with Brown and implied that she could have someone terminated if they were not the right kind of Christian. She and Brown both commented to Plaintiff Garcimonde-Fisher that a Catholic was not the "right kind" of Christian (Garcimonde-Fisher Dep. 225).[2] And, after a meeting, she requested one Area203 employee—a person she described as a "good Christian"—be the only one to remain on her account stating that no one else aligned with her goals.

Each year, Area203 hosted a Christmas Party for its employees. In 2008, James Cole opened the Christmas party with a sermon focusing on the ongoing battle against evil, abortion, and homosexuals (Pl. Cole Dep. 134; Garcimonde-Fisher Dep. 120). At the 2009 Christmas party, Brown opened the event by introducing Ron Beaver (the new Chief Operating Officer who had partially replaced Plaintiff Cole) as someone who is a good Christian aligned with his faith

---

[2] Brown claims that he did not know Plaintiff Garcimonde-Fisher's religion until this case (Brown Dep. 120).

and beliefs (Harris Dep. 163). At that same party, the employees were given gifts: a book about family, a book about abortion, and a "Horton Hears a Who" DVD (to demonstrate the importance of even the smallest things) (Harris Dep. 164).

In 2009, Area203 also hosted a "family fun day" for its employees at Fort Bluff Camp. Employees were required to attend a twenty-minute religious service in a chapel and sit through an additional thirty-minute religious presentation by Compassion International, an evangelical charity (Garcimonde-Fisher Dep. 124–26). At the end of this presentation, Compassion International solicited donations from the employees to support their work (*id*.)

Plaintiff Jeffrey Cole was hired as President of Area203 in November 2008. He reported directly to James Cole, who reported directly to Carey Brown. Plaintiff Cole alleges he reported both his and his subordinate's objections to the required religious events during his tenure at Area203. Plaintiff Cole submitted an expense report for mileage in late June 2009. Brown reviewed the reimbursement request and determined it to be false. Brown had traveled with Plaintiff Cole and knew Plaintiff Cole had rented a car rather than driving his own and was therefore ineligible to receive compensation for the mileage on the rental car. Plaintiff Cole was terminated in July 2009. After his termination, Brown told a newly hired Area203 employee Brown had terminated Plaintiff Cole because he was not the right kind of Christian.

Plaintiff Jeff Harris was hired in June 2009 as creative director and later partially replaced Plaintiff Cole as interim President. Plaintiff Harris was approached by Reynolds on several occasions inquiring why he was not in the bible studies. Plaintiff Harris also recalled a meeting with Naomi Crain where he was told that she wants "good Christians" for her work and that Plaintiff Harris, as a Catholic, does not read the "right" Bible. At the late February 2010 meeting with the company lawyer referenced above, Plaintiff Harris was singled out for his

4

religion.  It was in partial response to Plaintiff Harris' comments that Brown stated that if anyone did not like the religious material in the office, he could quit.

Plaintiff Lauren Garcimonde-Fisher was hired in March 2008 as a designer.  In October 2008, Plaintiff Garcimonde-Fisher was promoted to director of interactive services and in April 2009 she was promoted to Vice President of Operations.  After being required to attend the 2009 Christmas party, the family fun day, and other religious events, she complained to her supervisors, Plaintiffs Cole and Harris, who relayed her objections up the chain.  She also objected to being required to attend events where religious charities solicited donations from, Area203 employees.  She felt her attendance at these and other religious events were monitored by Brown, Beaver and James Cole.

Plaintiffs Harris and Garcimonde-Fisher hired Garcimonde-Fisher's husband, Jono Fisher for a photo shoot.  They submitted two invoices for the project, both under $1000, but that Ron Beaver thought violated his policy that any expenditure over $1000 be pre-approved because they should have been submitted as one invoice.  The parties dispute whether this actually violated the policy.  Defendant asserts that this and other performance related problems resulted in the terminations of Plaintiffs Harris and Garcimonde Fisher.

Plaintiffs filed this action in 2013 alleging a religiously hostile work environment, religious discrimination, and retaliation for their objections.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating no genuine issue of material fact

exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.   ANALYSIS

Defendant argues the Court should grant summary judgment for several reasons. Procedurally, Defendant argues Plaintiff Harris is judicially estopped from pursuing his claims and Plaintiffs Garcimonde-Fisher and Harris failed to exhaust administrative remedies as to some of their claims. Substantively, Defendant argues Plaintiffs have failed as a matter of law to put forth evidence sufficient to support their respective *prima facie* cases of a hostile work environment, retaliation, and discrimination.

### A.     Procedural Defenses

#### 1.     Judicial Estoppel

Judicial estoppel is an equitable doctrine that "bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding where (2) the prior court adopted the contrary position 'either as a matter or as part of a final disposition.'" *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008) (quoting *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002)). This doctrine "preserve[s] 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" *Browning*, 283 F.3d at 776 (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)). Although there is "no set formula for assessing when judicial estoppel should apply," *In re Commonwealth Inst. Sec.*, 394 F.3d 401, 406 (6th Cir. 2005), at a minimum, "a party's later position must be clearly inconsistent with its earlier position for judicial estoppel to apply." *Lorillard Tobacco*, 546 F.3d at 757 (internal quotation marks omitted).

Plaintiff Harris filed for Chapter 13 bankruptcy in December 2009. As part of Plaintiff Harris's bankruptcy filing he was required to disclose his personal property, including "contingent and unliquidated claims of every nature" (Court File No. 36-8, p. 12). At the time of

7

his initial filing, Plaintiff Harris stated he had none (*id.*). Plaintiff Harris argues this position was not contrary to his current position, because, at the time of his initial filing, December 2009, he had no claims against Defendant, as he had not yet been fired (Court File No. 39, Pls.' Resp. at 18). Defendant argues Plaintiff Harris had a continuing duty to update his disclosures and should have reported the claim once he was terminated. Plaintiff Harris however, points out that when he converted his Chapter 13 bankruptcy to his Chapter 7 bankruptcy, he had no obligation to disclose the claim because "when a case under chapter 13 of this title is converted to a case under another chapter . . . property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion." 11 U.S.C. § 348(f)(1)(A). Plaintiff Harris' claim accrued on March 30, 2010, according to the date of discrimination he listed on his EEOC filing (Court File No. 36-6, Harris Dep., Ex. 2). Defendant has not pointed to any statement made after that date but before the conversion to Chapter 7 that conflicts with his current position. Because Plaintiff Harris converted his estate to Chapter 7, he was not required to disclose claims that accrued after the date of his original petition. *See* 11 U.S.C. § 348(f)(1)(A). Plaintiff Harris therefore did not assert a contrary position and judicial estoppel is not appropriate.

## 2.     Exhaustion of Administrative Remedies

A plaintiff suing under federal civil rights laws must exhaust his administrative remedies before bringing the suit in federal court. Filing an EEOC charge is a condition precedent to filing suit under Title VII, 42 U.S.C. § 2000e-5(e)(1). *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000). Claims not included in the charge may not be brought in a subsequently filed action. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010)

(citing 42 U.S.C. § 2000e-5(f)(1)) ("As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge."). "This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *Id*. Courts, however, understand EEOC charges are typically filed pro se and will construe the charges liberally, entertaining "claims that are reasonably related to or grow out of the factual allegations of the EEOC charge." *Id*. at 362. A Title VII plaintiff can exhaust administrative remedies in one of two ways. A plaintiff can explicitly state a claim in the charge by, for example, checking the box for retaliation. Alternatively, a plaintiff may state "facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim . . . ." *Id*. (quoting *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998)).

Defendant argues Plaintiffs Harris and Garcimonde-Fisher's retaliation claims should be dismissed because they failed to exhaust administrative remedies. While neither Plaintiff Harris nor Plaintiff Garcimonde-Fisher checked the box for retaliation on their EEOC charge, both of their EEOC determination letters reflect that the Commission investigated and found probable cause to believe that Plaintiffs were discharged for objecting to mandatory religious events[3] (Court File No. 39-7, Henrichsen Dec., Exs. B, C).[4] Because facts related to the charged claim did in fact result in the EEOC investigating the retaliation claim, neither Plaintiff is precluded

_____

[3] The parties dispute whether these events were mandatory.

[4] Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Opposition to mandated participation in religious activities would fall under the "opposition clause."

from bringing their retaliation claim.[5]  *See Younis*, 31 F.3d at 362.

Defendant also argues Plaintiffs Harris and Garcimonde-Fisher's hostile work environment claims should be dismissed for failure to exhaust administrative remedies. The EEOC claim form does not have a check box for hostile work environment, and so the Court will look first to the narrative charged by the Plaintiff to see whether the Plaintiff alleged facts that would lead to an investigation of a hostile work environment claim, see *Younis*, 610 F.3d at 361, and then to the EEOC Determination to see if the EEOC in fact investigated a hostile work environment claim, see *id.* at 362.

A workplace is hostile if it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). "[T]he inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion . . . unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge. *Id.* (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 503 (7th Cir. 1994)). In *Younis*, the plaintiff pilot filed an EEOC charge alleging

> I was subjected to two Proficiency checks, around the last week of August 2005; and I was advised that I had failed both checks. Ultimately, I was discharged for an alleged inability to pass Proficiency Checks.
> I believe that I have been discriminated against because of my religion (Muslim)

---

[5] Defendant attempts to construe Plaintiff's argument as asking for a holding that an EEOC determination trumps the language set forth in the charge. But their objection is misplaced. This is simply the straightforward application of the rule that has been in effect in the Sixth Circuit since at least 1981. *Farmer v. ARA Servs., Inc.*, 660 F.2d 1096, 1105 (6th Cir. 1981). When an EEOC charge would or does in fact lead to an investigation into a different, uncharged claim, a plaintiff is not barred from bringing suit on that claim. *Id.* And this rule has been repeatedly affirmed, see for example *Davis*, 157 F.3d at 464. One of the more recent examples affirming this rule is *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010), a case on which Defendant heavily relies.

and National Origin (Arab) in violation of Title VII of the Civil Rights Act of
1964, as amended.

EEOC Charge, Court File No. 38-17 in No. 2:07-cv-02356-BBD-dkv, W.D. Tenn., *Younis v.
Pinnacle Airlines*, 31 F.3d 359 (6th Cir. 2010). Because the plaintiff had alleged only discrete
acts, the Sixth Circuit found he had not sufficiently alleged a hostile work environment claim for
exhaustion purposes and affirmed the trial court's grant of summary judgment on the hostile
work environment claim. *Younis*, 31 F.3d at 362. Similarly, in *Clark v. Hoops, LP*, the Western
District of Tennessee held a plaintiff's EEOC charge alleging "the denial of training, use of
substandard equipment, and discrepancies in pay" did not allege facts sufficient to exhaust
administrative remedies for his hostile work environment claim. 709 F. Supp. 2d 657, 664
(W.D. Tenn. 2010).

By contrast, in *Williams v. CSX Transp. Co., Inc.*, the Sixth Circuit found the Plaintiff's
EEOC filing did contain sufficient information to allege a hostile work environment claim where
the filing contained a detailed account of a racially and sexually hostile incident between the
plaintiff and one of her supervisors and alleged the discrimination was a continuing action. 643
F.3d 502, 509–10 (6th Cir. 2011). More recently, in *Spence v. Donahue*, the Sixth Circuit held
an employee properly exhausted administrative remedies for a hostile work environment claim
where the claim alleged "harassment" and "intimidation." 515 F. App'x 561, 571 (6th Cir.
2013).

Plaintiff Harris' EEOC Charge alleges

I was required to attend mandatory bible study during work hours even when I
expressed my desire not to attend
I was required to attend mandatory religious events sponsored by the company
even when I expressed my desire not to attend.
I was fired after not attending mandatory bible study and replaced by by [sic] two
younger workers, both less qualified than I am and the more senior position going
to a Southern Baptist Christian.

(Cour File No. 36-6, Harris Dep., Ex. 2).

Plaintiff Garcimonde-Fisher's EEOC Charge alleges, in relevant part,

I was required to attend religious events sponsored by the company even when I expressed my desire NOT to attend.
I was required to attend mandatory bible study during work hours even when I expressed my desire not to attend.
I was fired after failing to attend religious events . . . .

(Court File No. 36-4, Garcimonde-Fisher Dep., Ex. 2) (emphasis in original). While the charges do not use the term "hostile work environment," the allegations are sufficient to prompt the EEOC to investigate a hostile work environment claim. The charges paint the picture of a work environment dominated by religious intimidation where employees were given an ultimatum "Your religion or your job." Such facts could lead the EEOC to investigate a hostile work environment claim. Plaintiffs Harris and Garcimonde-Fisher have satisfied the administrative exhaustion requirement for their hostile work environment claims.[6]

### B.    Substantive Claims

#### 1.    Hostile Work Environment

Defendant argues Plaintiffs have failed to produce evidence sufficient to support their hostile work environment claims. To prevail on a hostile work environment claim, a plaintiff must show 1) he or she was a member of a protected class, 2) he or she was subjected to unwanted religious harassment, 3) the harassment was based on the plaintiff's religion, 4) the

---

[6] This conclusion is supported by the Fisher EEOC Determination Letter which found that the Defendant placed religious material throughout the business, encouraged attendance at bible studies and religious company parties, and required employee attendance at prayer sessions despite her objections (Court File No. 39-7, Henrichsen Dec., Ex. B). The Harris Determination Letter contains these findings, and notes that witness testimony supported that Defendant tracked attendance at the bible studies (Court File No. 39-7, Henrichsen Dec., Ex. B). While these witness statements may not be admissible into evidence, they are relevant to the Court's determination of whether the EEOC was prompted to investigate hostile work environment claims.

harassment resulted in a hostile work environment and 5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). A workplace is hostile if it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks and citation omitted). Title VII does not create "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). Nor does it mandate a workplace free from religion. The Court examines the totality of the circumstances to determine whether an environment is hostile or abusive. Factors include "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Not only must the conduct be objectively hostile or abusive, the victim must "subjectively perceive the environment to be abusive." *Id.* at 21. Defendant argues none of the Plaintiffs has stated a hostile work environment claim because the conduct is not sufficiently severe or pervasive to rise to the level of a hostile work environment claim.

Much of the law relating to discrimination claims comes from sex and race discrimination, but courts must apply these holdings in the religious discrimination context with regard for the wide range of factual circumstances presented by varying claims. The guiding principle in assessing hostile work environment claims is whether employees outside the dominant sect "are exposed to disadvantageous terms or conditions of employment to which members of the [dominant religion] are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring).

In their depositions, Plaintiffs describe the extent to which Brown's Evangelical

Protestant faith permeated Area203. The office was decorated with Judeo-Christian artwork and biblical posters (Pl. Cole Dep. 82). Materials with evangelical messages and solicitations for donations to overtly evangelical charities were distributed to employees (Pl. Cole Dep. 211). The break room had a TV that looped Christian movies all day long (Garcimonde-Fisher Dep. 232). Evangelical charities were invited to give presentations employees were required to attend and allowed to solicit donations from employees (Garcimonde-Fisher Dep. 232, 238–41; Pl. Cole Dep. 137–140). Area203 kept an evangelical chaplain on staff (Garcimonde-Fisher Dep. 157). Mandatory prayer meetings and religious events were scheduled during work hours and employees (Pl. Cole Dep. 211; Garcimonde-Fisher Dep. 157; Harris Dep. 220). Privileges were given to employees who chose to attend and Brown kept track of those who chose not to participate (Pl. Cole Dep. 211).[7] Even work meetings were begun with prayer (Harris Dep. 223).

Many of the Plaintiffs allegations surrounded the company's Christmas parties in 2008 and 2009 and the Family Fun Day. At the 2008 company Christmas party Jim Cole gave a sermon about the battle against evil, abortion, and homosexuals (Pl. Cole Dep. 134; Garcimonde-Fisher Dep. 120). At the 2009 Christmas party Brown opened the event introducing Ron Beaver as someone who is a good Christian and aligns with my faith and belief (Harris Dep. 163). At the same party, the employees were given gifts, a book about family, a book about abortion and a "Horton Hears a Who" DVD (Harris Dep. 164). In 2009, Area203 also hosted a "family fun day" for its employees at Fort Bluff Camp. Employees were required to attend a twenty-minute religious service in a chapel and sit through an additional thirty-minute religious presentation by Compassion International, an evangelical charity, in which the organization also solicited donations (Garcimonde-Fisher Dep. 124–26).

---

[7] As evidence of this monitoring Fisher points to a "Thank You" email sent out after one such event listing the names of attendees (Fisher Dep.147).

Brown allegedly made comments Plaintiffs perceived as derogatory toward their religion. He stated the King James Version of the Bible was the "correct" version (Pl. Cole Dep. 199). He also stated a Catholic was not the "right kind of Christian" to Plaintiff Garcimonde-Fisher, a Catholic (Garcimonde-Fisher Dep. 225). At a meeting with the company's lawyer, Brown stated that those who find the religious materials decorating the walls discriminatory can just quit.

To support a claim for a hostile work environment, the harassment alleged must be severe. In *Lundy v. Gen. Motors Corp.*, for example, the Sixth Circuit found that Lundy, a Catholic, had failed to establish a *prima facie* case for his hostile work environment claim. 101 F. App'x 68, 71–72 (6th Cir. 2004). Lundy presented evidence that coworkers created pictures of him as a satanic figure with a goat head and placed them in his tool box, his coworkers inscribed his toolbox with the number 666 and Lundy's supervisor had told him he belonged to the KKK, a group that hates Catholics. *Id.* at 72. Similarly, in *Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*, the Sixth Circuit also found that Bourini, a Muslim, had failed to produce evidence to support a prima facie case for his hostile work environment claim. 136 F. App'x 747, 749 (6th Cir. 2005). Bourini had found slurs in the bathroom stalls stating that "the 'I' in 'Islam' stood for 'idiots,' the 's' for 'shit bags,' the 'l' for 'losers,' the 'a' for 'assholes,' and the 'm' for 'morons'" *Id.* at 749. He found a pamphlet of Christian proselytizing material addressed to "My Muslim Friend" on his workstation. *Id.* The court held these events did not rise to the level of a hostile work environment claim.

By contrast, the Southern District of Indiana faced a strikingly similar set of factual circumstances to those alleged here in a "pattern or practice" case brought by the EEOC itself, *E.E.O.C. v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763 (S.D. Ind. 2002). The owner of the business openly shared her beliefs and incorporated those beliefs into the mission statement of

the corporation. She selected management personnel at least in part on the basis of their faith. Training and development programs focused on fundamentalist Christian ideology. Managers were required to attend devotions and religious services. Employees were provided with religious materials at work and meetings were opened with prayer. Catholic beliefs were belittled by management and Catholic employees were referred to as nonbelievers.

The employer argued that the employees' participation in these activities was entirely voluntary: employees were free to throw away the religious materials they received and did not have to attend the devotions and prayers. The court however, found

> [w]hile there was no written policy expressly requiring employees to attend devotions or other prayers or to attend religious videos or the anointing of buildings or offices, the EEOC has presented sufficient evidence to raise a reasonable inference that Ms. Steuerwald's "expectation" of attendance and her "expectation" of other behaviors amounted to a form of coercion-more subtle, perhaps, than an express policy on pain of discharge, but no less coercive.

*Id*. at 837. The court pointed to evidence showing employees knew that they were "expected" to attend these religious events and that management indeed tracked attendance at these events. *Id*. at 837–38. From this evidence, a jury could conclude the practices were not in fact voluntary and the Court thus found the individual employees had supported a hostile work environment claim. *Id*.

The holdings in *Lundy* and *Bourini* demonstrate that if the complaint alleges only isolated instances of conduct, a high degree of hostility is required to support a claim of a hostile work environment. This is because a hostile work environment claim requires the plaintiff to demonstrate a culture that is so pervasive it effectively alters the conditions of employment. *See Harris*, 510 U.S. at 21. Such isolated instances—while certainly not pleasant for the employee on the receiving end—are not within the purview of Title VII. *See Oncale*, 523 U.S. at 80

16

(noting that Title VII does not create "a general civility code for the American workplace"). While decided under a slightly different standard, *Preferred Management* demonstrates that when the teachings and practices of an employer's religious sect saturate a workplace such that an employee is constantly bombarded with those teachings such a workplace may be considered hostile. Such profusion may effectively alter the terms of employment in a way that disadvantages the religious outsider who is thus faced with the choice "My religion or my job?" Title VII forbids employers from forcing employees to make this choice whether overtly or covertly. Hostile work environment claims prevent employers from creating conditions that are inhospitable to any but those who share their beliefs. *See id.* at 838 ("Protecting an employee's right to be free from forced observance of the religion of his employer is at the heart of Title VII's prohibition against religious discrimination.") (quoting *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620–21 (9th Cir. 1988))

Taking all of the above evidence in the light most favorable to the Plaintiffs, they have put forth evidence to support a *prima facie* case for their hostile work environment claims. The references to the King James Bible as the proper Bible and to Catholicism as not the "right kind" of Christianity could fairly be described as derogatory (Pl. Cole Dep. 199; Garcimonde-Fisher Dep. 225). While these comments may not be as overtly hostile as depicting a coworker as a satanic figure, they do serve to reinforce the omnipresent message of the workplace that Carey Brown's religion is the only religion that will be tolerated. Plaintiffs presented evidence Brown himself said as much—if you don't like my religion, you can quit (Harris Dep. 147–48, 265). Plaintiff has presented evidence of a workplace that parallels that found in *Preferred Management*. Both Brown and the owner of Preferred openly shared their beliefs and incorporated those beliefs into the mission statement of the corporation (Brown Dep. 64–65).

17

Like the owner of Preferred, Brown wanted the "right kind of Christian" in management (Bickerstaff Dep. 63; Garcimonde-Fisher Dep. 225; Harris Dep. 163). In both companies, training and development programs focused on fundamentalist Christian ideology and managers were required to attend devotions and religious services (Pl. Cole Dep. 210–11; Garcimonde-Fisher Dep. 157; Harris Dep. 220). It is undisputed that, like Preferred, Browns employees were provided with religious materials at work and meetings were opened with prayer (Harris Dep. 223). And finally, the management of both companies belittled Catholic beliefs (Garcimonde-Fisher Dep. 225).

Overwhelming pressure to conform to a particular religion or sect may rise to the level of a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. The close involvement of Brown, the owner of the company, and the fact that many of his comments form the basis of the claim is sufficient to hold the corporation vicariously liable. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."). Because a jury could conclude Defendant created a religiously hostile work environment, the Court will **DENY** Defendant's motion for summary judgment on Plaintiff's hostile work environment claims.

## 2. Discrimination

Plaintiffs Cole, Harris, and Garcimonde-Fisher allege they were discriminated against on the basis of religion. Title VII of the Civil Rights Act of 1964 provides "it shall be an unlawful employment practice for an employer to . . . discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To establish a prima facie claim of discrimination, a plaintiff must show "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was . . . treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). In a discrimination claim, an employment action is adverse if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014), *reh'g denied* (Apr. 2, 2014) (quoting *Ellerth*, 524 U.S. at 761).

A plaintiff will prevail on his Title VII claim if he "establish[es] that the defendant had a discriminatory intent or motive for taking a job-related action." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (quoting *Ricci v. DeStefano*, 557 U.S. 557 (2009)). "The plaintiff may show this discriminatory intent through the use of either direct or circumstantial evidence." *Id.* "The direct evidence and circumstantial evidence paths are mutually exclusive; the plaintiff can meet [his] burden with either method of proof." *Weberg v. Franks*, 229 F.3d 514, 522–23 (6th Cir. 2000).

A circumstantial discrimination claim is evaluated using the familiar burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). A

19

"[p]laintiff's burden with respect to establishing a prima facie case is not onerous." *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 377 (6th Cir. 1984) (citation omitted).

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory explanation for its actions. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003) (citing *Burdine*, 450 U.S. at 253). If the employer does so, the burden shifts back to the plaintiff to demonstrate the employer's explanation is pretext. *McDonnell Douglas*, 411 U.S. at 802–04, 807. Throughout this burden shifting, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253*); see also DiCarlo v. Potter*, 358 F.3d 408, 414–415 (6th Cir. 2004). The plaintiff cannot rely purely on "mere personal belief, conjecture and speculation" as they are insufficient to support an inference of discrimination. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (internal alteration omitted).

If a plaintiff proves his initial case by direct evidence, the claim is not subject to the *McDonnell Douglas* burden shifting. *Chattman*, 686 F.3d at 346. "Instead, the plaintiff's case-in-chief is met, and 'the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'" *Id.* (quoting *DiCarlo*, 358 F.3d at 415). "Direct evidence is 'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 262 (6th Cir. 2005) (quoting *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 192 (Mich. 2003)). It must show the decision maker either had a religious bias or such a bias motivated the challenged decision. *Hussain*, 126 F. App'x. at 262. "[A] corporate decision maker's express statement of

a desire to remove employees in the protected group is direct evidence of discriminatory intent. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). But, comments made by people who are not decision makers generally cannot constitute direct evidence of discrimination. *Id.*

### a. Plaintiff Cole

Plaintiff Cole argues he has presented direct evidence of discrimination. Todd Bickerstaff met with Carey Brown soon after Plaintiff Cole's firing. Bickerstaff, a relatively new hire, was sad to hear Plaintiff Cole had been terminated because he had looked forward to working with him. When Bickerstaff asked what had led to Plaintiff Cole's termination, he was unsatisfied by the answer. But, when he challenged whether those events justified the decision to terminate Plaintiff Cole, Brown responded that "he felt that [Plaintiff Cole] was not the type of Christian he wanted in leadership in his company and that he drank a lot of beer" (Bickerstaff Dep. 63). This evidence, if believed, establishes that religion was a motivating factor in Plaintiff's firing. Defendant may argue that what Brown meant was that the decision was motivated by a lack of trust in Plaintiff Cole's morality, but this argument is better directed to the jury as the finder of fact than to the Court on summary judgment. Because this conversation constitutes direct evidence of discrimination, the Court will **DENY** Defendant's motion for summary judgment on Plaintiff Cole's discrimination claim.

### b. Plaintiff Harris

Plaintiff Harris points to several events that, he argues, constitute direct evidence (Pl. Resp. at 21–22). Defendant argues these do not constitute direct evidence of discrimination.[8] In

---

[8] Defendant argues that Plaintiff Harris conceded that he had no direct evidence of discrimination in his deposition. Defendant points to the following colloquy:

Q:     Did you ever see anything in writing indicating that you were being treated a certain way because of religion?

January 2010 Plaintiff had a conversation with Ron Beaver where Beaver stated if he wanted a promotion to president, he would have to convince Brown, who was not sure Harris was "in line with his moral beliefs" (Harris Dep. 221).  During a February 26, 2010 meeting with company legal counsel, the lawyer noted that Plaintiff Harris, as a Catholic, might be offended by the religious literature in the office (Harris Dep. 147–48, 265).  In response, Brown stood up and said if Plaintiff Harris did not like the material, he did not care if he quit (Harris Dep. 148). Brown also allegedly removed several employees from an account because a client felt these employees did not "underst[and] her and her goals"  (Harris Dep. 269).  Plaintiff Harris understood this as a reference to religion because the client had made several comments about the importance of religion to her and had commented in reference to the one employee who was kept on the account that "[the employee] gets me, you know, he's a Christian"  (Harris Dep. 268–69).

To constitute direct evidence of discrimination, statements must not only be facially discriminatory, they must also be causally related to the adverse employment action, here, Plaintiff Harris' termination.  *Hussain*, 126 F. App'x. at 263.  "Statements made by an immediate supervisor and decision maker, that specifically and derogatorily reference an employee's [protected status] and that are in a close temporal proximity to the termination decision, present sufficient evidence of causation." *Id*.  Here, Plaintiff Harris was promoted from interim President to President of Area203 in February 2010—right in the middle of the the time period during which these allegedly discriminatory comments were made.  The proximity of the promotion to

---

A:      Not that I can recall.
Q:      Did anyone ever tell you that you were being treated in a certain way because of your religion?
A:      Not that I know of.

(Harris Dep. 234).

these discriminatory comments and the fact that Plaintiff was not terminated until March 30 dictate that these comments cannot constitute direct evidence of a discriminator motive in the termination because they do not *require* the conclusion that there was a discriminatory motive. *Hussain*, 126 F. App'x. at 262.

As to circumstantial evidence, Defendant disputes whether Plaintiff can establish the fourth element of his *prima facie* case; that he was replaced by someone outside his protected class or that Area203 treated similarly situated employees outside his protected class more favorably. Plaintiff Harris alleges two adverse actions: 1) he did not get a raise when he was promoted to President and 2) he was terminated. Plaintiff Harris cannot point to any other employee who did receive a raise during that time period, and so he does not meet his *prima facie* case of discrimination with regard to his failure to receive a raise (Harris Dep. 234).[9] Plaintiff also fails to point to a similarly situated employee with regard to the photo shoot allegations who was not terminated. Plaintiff Harris does allege he was replaced by Doug Freeman, but does not point to any evidence that Freeman was outside of Plaintiff Harris' protected class. Because Plaintiff Harris presented neither direct nor circumstantial evidence to support his claim of discrimination, the Court must **GRANT** Defendant's motion for summary judgment as to this claim.

### c. Plaintiff Garcimonde-Fisher

Defendant argues Plaintiff Garcimonde-Fisher has never asserted a religious discrimination claim. However, in the Complaint, Plaintiff Harris is listed along with her co-

---

[9] Plaintiff Harris argues that there was evidence that casts doubt on whether the company was actually in a financial situation that required a salary freeze (Pl. Resp. 26). Plaintiff, however, is putting the cart before the horse. A plaintiff must first put forth evidence to support a *prima facie* case before the Court will consider whether the employer's proffered reason for the action was pretextual. *Vaughn*, 291 F.3d at 906. Because Plaintiff Harris failed to satisfy the elements of the prima facie case, the Court cannot consider whether the proffered reason was pretextual.

Plaintiffs under the Count alleging religious discrimination (Court File No. 1, Compl. ¶¶ 85–92). Plaintiff Garcimonde-Fisher argues comments made by Brown that she was not "the right kind of Christian" constitute direct evidence of discrimination. While these comments are similar to the comment directed at Plaintiff Cole that the Court found did constitute direct evidence, this comment lacks the causal connection required for direct evidence. "Direct evidence is 'evidence which, if believed, *requires* the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Hussain v.*, 126 F. App'x at 262 (emphasis added) (quoting *Sniecinski*, 666 N.W.2d at192). Brown made the comment with regard to Plaintiff Cole in direct response to questions regarding the reason for Plaintiff Cole's termination. By contrast, the comment to Plaintiff Gracimonde-Fisher was made in 2009, (Garcimonde-Fisher Dep. 93), and Plaintiff Garcimonde-Fisher was not terminated until March 2010. While "[s]tatements made by [a] . . . decision maker, that specifically and derogatorily reference an employee's [protected status] . . . that are in a close temporal proximity to the termination decision, present sufficient evidence of causation," statements made outside the requisite close temporal proximity do not. *Hussain*, 126 F. App'x. at 263. Plaintiff Garcimonde-Fisher has failed to provide direct evidence of her discrimination claim. With regard to circumstantial evidence, Plaintiff's Response Brief does not reference Plaintiff Garcimonde-Fisher at all in its section addressing Plaintiffs' circumstantial evidence of discrimination (Court File No. 39, Pl. Resp. 25–27). Because Plaintiff Garcimonde-Fisher has not pointed to evidence sufficient to carry her burden on either a direct evidence or a circumstantial evidence theory of discrimination, the Court will **GRANT** Defendant's motion for summary judgment as to Plaintiff Garcimonde-Fisher's discrimination claim.

### 3. Retaliation

Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Opposition to mandated participation in religious activities would fall under the "opposition clause."

> To establish a *prima facie* retaliation case, a plaintiff must prove
>
> (1) she engaged in activity protected by [civil rights statutes]; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). This is not an onerous burden; rather, it is one easily met. *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

Defendant argues the Plaintiffs have failed to allege they participated in protected activity. Specifically, Defendant argues Plaintiffs did not object to an unlawful employment practice, only employment practices Plaintiffs felt were inappropriate. Defendant also argues Plaintiffs have failed to put forth evidence demonstrating a causal connection between the objections and the adverse employment action.

The Court will first address whether Plaintiffs' complaints constituted protected activity. For the employee's complaints to constitute protected activity, the employee need only have held a good faith, reasonable belief the employment practice was unlawful. *Clark v. Sanofi-*

25

*Synthelabo, Inc.*, 489 F. Supp. 2d 759, 768 (W.D. Ky. 2007).[10]   The question is whether the employees reasonably believed Area203's employment practices were illegal.   Employers are required to make reasonable accommodations of employee's religious practices.   42 U.S.C. § 2000-e(j); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 73–74 (1977).   An employee's objection to attending a religious event can constitute a religious practice that requires a reasonable accommodation. *Townley*, 859 F.2d at 613.   Indeed, courts have held "requiring employees over their objections to attend devotional services cannot be reconciled with Title VII's prohibition against religious discrimination." *Id.*; *see also Preferred Mgmt. Corp.*, 216 F. Supp. 2d at 838 ("Protecting an employee's right to be free from forced observance of the religion of his employer is at the heart of Title VII's prohibition against religious discrimination.") (quoting *Townley*, 859 F.2d at 620–21).   Plaintiffs could have reasonably believed Area203's employment practices violated Title VII.

The fourth element, causation, requires "a plaintiff [to] produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the

---

[10] The Sixth Circuit has not specifically addressed whether a "reasonable belief" that an employment practice is discriminatory is all that is required to state a retaliation claim under the opposition clause. *Clark*, 489 F. Supp. 2d at 768 n.8.  But, it has at least implicitly endorsed a version of this rule. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312–13 (6th Cir. 1989) ("A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful.").  And, several district courts within the Sixth Circuit have expressly adopted the "reasonable belief" rule in opposition clause retaliation claims; see, for example, *id.* at 768; *Boden v. Anaconda Minerals Co.*, 757 F. Supp. 848, 853 (S.D. Ohio 1990); *Boyd v. James S. Hayes Living Health Care Agency, Inc.*, 671 F. Supp. 1155, 1168 (W.D. Tenn. 1987); *Croushorn v. Bd. of Trustees of Univ. of Tennessee*, 518 F. Supp. 9, 25 (M.D. Tenn. 1980); as have several Circuits; see, for example, *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982); *Parker v. Baltimore & O. R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981); *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978).  This Court agrees with the reasoning set forth in those cases and holds that a retaliation claim under the opposition clause requires only a reasonable belief that the employment practice was unlawful.

26

plaintiff not filed a discrimination action. *Nguyen*, 229 F.3d at 563. Close temporal proximity alone may be sufficient in some cases to establish causation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see also Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) (finding that two months between the protected activity and the retaliation established causation); *DiCarlo*, 358 F.3d at 421 (finding that 21 days between the protected activity and the retaliation established causation) (*overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 168, 180 (2009)); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding that three months between the protected activity and the retaliation established causation). Where the time between the protected activity and the alleged retaliation is more protracted, an employee must present some other evidence to support a causal connection between the opposition and the retaliation. *Id*.

Plaintiff Cole complained about Brown's practice of requiring employees to attend religious functions (Pl. Cole Dep. 221). In response, Brown stated "well, they are required to attend it, and anybody worth their weight as a manager should be able to compel their people to be there" (Pl. Cole Dep. 221). Plaintiff Cole also relayed concerns from both Christians and non-Christians regarding being required to attend religious events to Jim Cole (Pl. Cole Dep. 223–24) who in turn relayed those concerns to Brown (Brown Dep. 94–95).[11] Plaintiff Cole thought these practices were illegal (*see* Pl. Cole Dep. 261 ("Being required to attend religious functions, being subjected to meetings where prayer was part of the ongoing activity. It's my understanding that those things are illegal")). Though it is unclear the exact timeline for these events and the concurrent objections, at least one of these religious events took place in early 2009 (Pl. Cole Dep. 219). Plaintiff Cole was terminated by Brown in July 2009 (Brown Dep.

---

[11] Brown denied any knowledge of who the complaining employees were (Brown Dep. 93).

116). This timeline, coupled with the implicit threat that Plaintiff Cole's continued employment as a manager hinged on his ability to compel attendance at these events is sufficient to establish causation.

Similarly, Plaintiff Harris has also produced evidence of causation. When Area203's own lawyer commented that employees may find the religious literature discriminatory and singled out Plaintiff Harris as someone who may find it discriminatory, Plaintiff Harris confirmed he was such a person. Brown stood up and stated "well I don't care if you want to quit" (Harris Dep. 147–148). One month later, Plaintiff Harris was terminated by Jim Cole, Carey Brown, and Ron Beaver (Beaver Dep. 144).[12] Such a directed comment by the owner of the company who was directly involved in Plaintiff Harris' termination in close temporal proximity to termination suffices to establish Plaintiff Harris' *prima facie* case of retaliation.

And finally, Plaintiff Garcimonde-Fisher has also established a causal connection between her protected activity and her termination. Plaintiff Garcimonde-Fisher reported concerns with being required to attend religious events to Plaintiff Cole (Garcimonde-Fisher Dep. 248) who then relayed these complaints to Jim Cole (Pl. Cole Dep. 223–25) who in turn relayed those concerns to Brown (Brown Dep. 94–95).[13] Plaintiff Garcimonde-Fisher was terminated as part of a collaborative decision by Jim Cole, Carey Brown and Ron Beaver (Beaver Dep. 144).[14] Although the temporal proximity here is more attenuated, the circumstantial evidence regarding the termination suffices to show retaliation; Plaintiff Garcimonde-Fisher had relayed her complaints to Plaintiff Harris who was terminated on the

---

[12] Brown denies being involved with Plaintiff Harris' termination (Brown Dep. 139).

[13] Brown denied any knowledge of who the complaining employees were (Brown Dep. 93).

[14] Brown denies being involved with Plaintiff Fisher's termination (Brown Dep. 139).

28

same day as Plaintiff Garcimonde-Fisher soon after the employment discrimination meeting in which Brown stated if Plaintiff Harris did not like religion in the workplace, he could quit. *Cf. Harrison v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 80 F.3d 1107, 1119 (6th Cir. 1996) (finding that the plaintiff had met his burden as to causation where the termination came one year and three months after he engaged in the protected activity but "the evidence showed that three employees feared retaliation because they testified at [the plaintiff's] hearing, and that [his employer] made repeated comments that suggested he would not hesitate to run employees out of his department.") *overruled on other grounds by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 (6th Cir.1999).

Once a plaintiff meets his burden of production as to the prima facie case, the burden then shifts to the employer to set forth legitimate, nondiscriminatory reasons for the adverse action. *Burdine*, 450 U.S. at 252–53. The explanation must be "clear and reasonably specific" supported by "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not motivated by discriminatory animus." *White*, 533 F.3d at 392 (quoting *Burdine*, 450 U.S. at 257-58) (internal quotation marks omitted). The plaintiff then must produce evidence that shows that the reasons offered were pretextual. *Burdine*, 450 U.S. at 253. "[T]he burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff." *Gragg v. Somersett Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004) (citation omitted). To establish pretext, the Plaintiffs must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Human Serv.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Defendant asserts Plaintiff Cole was terminated because he falsified an expense report (Brown Dep. 116). Plaintiff Cole's first argument is that this is pretextual because, four to five days prior to his termination, Brown and Jim Cole gave him positive reviews and stated that he "wasn't going anywhere" (Pl. Cole Dep. 165). Plaintiff Cole has not pointed to any intervening protected activity in those 4 to 5 days and so this evidence is inconclusive. However, Plaintiff Cole does point out at least two other presidents of Brown's companies had problems with expense reports and were not terminated (James Cole Dep. 200). Since the expense report problem is the only reason given by Area203 for his termination and Plaintiff Cole has presented evidence similarly situated employees were not terminated, a jury could conclude "the proffered reasons did not actually motivate the employer's action . . . ." *Chen*, 580 F.3d at 400. The Court will **DENY** Defendant's motion for summary judgment as to Plaintiff Cole's retaliation claim.

Defendant asserts Plaintiffs Harris and Garcimonde-Fisher were terminated for poor performance[15] and issues related to improper submission of invoices for the photo shoot reimbursement requests (Beaver Dep. 167). Plaintiff Harris has pointed to evidence showing his replacement Doug Freeman was not terminated and in fact received a performance bonus despite failing to meet his performance goals (Beaver Dep. 131). And, throughout the depositions of Area203 officers including James Cole, Ron Beaver, and Carey Brown, they repeatedly asserted Fifth Amendment privileges when asked questions regarding the financial state of Area203. What little information was revealed cast doubt on Defendant's claim that Area203 suffered from performance problems and at least implied that Plaintiffs Harris and Garcimonde-Fisher

---

[15] These performance issues are set out in detail in Exhibits 18 and 37 to Ron Beaver's deposition.

may have had the deck stacked against them.[16]  For example, both James Cole and Ron Beaver

stated that Area203's rent was $213,119.50 for a three to four month period in 2008 (James Cole

Dep. 156–59) and then $232,494 for 2009 and 2010 (Beaver Dep. 125–27).  Yet, the space

leased was only about 800 to 1000 sq. ft. (Butti Dep. 57).  Such information at least calls into

question the validity of the financial information relied upon by the company, and thus also calls

into question the legitimacy of the company's proffered reasons for discharging Plaintiff's

Garcimonde-Fisher and Harris as being related to performance issues with the company.[17]

        To the extent Area203 asserts the performance issues were related to customer

complaints, Plaintiffs have put forth evidence from which a jury could conclude the customer

complaints themselves were the result of religious objections and a firing based on the

complaints would be pretextual.  As detailed above, Plaintiffs have presented evidence that at

least one client, Naomi Crain, only wanted evangelical Christians working on her account

(Harris Dep. 268–69).  And, under the cat's paw doctrine, if a Plaintiff presents evidence from

which the jury could conclude the decision maker acted on the discriminatory or retaliatory

animus of another, "that retaliatory animus is imputed to the decision maker."  *Gibson v. United

Airlines, Inc.*, 783 F. Supp. 2d 983, 990 (E.D. Mich. 2011); *see also Madden v. Chattanooga City

Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008).  In any event, the documentation of the

performance problems was not created until after the decision to terminate Plaintiffs had been

made (*see* James Cole Dep. 198–99 (noting the lack of a disciplinary record in Plaintiffs'

disciplinary files at the time Ron Beaver recommended their termination) which could support a

---

[16] Ron Beaver admits that Plaintiffs Fisher and Harris were not fired solely for photo shoot issue
(Beaver Dep. 166).

[17] "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions
when they refuse to testify in response to probative evidence offered against them."  *Baxter v.
Palmigiano*, 425 U.S. 308, 318 (1976).

31

jury finding that these problems did not actually motivate the termination. Taken together, these facts could allow a jury to draw the inference that the performance problems were pretextual.

The Court will thus **DENY** Defendant's motions for summary judgment as to the retaliation claims of Plaintiffs Harris and Garcimonde-Fisher.


IV.     **CONCLUSION**

For the reasons set forth above, Court will **GRANT IN PART** and **DENY IN PART** the Defendant's motion for summary judgment (Court File No. 36). The Case will proceed with regard to Plaintiff Cole's discrimination claim and each of the Plaintiffs' retaliation claims and hostile work environment claims.

**An order shall enter.**

                                        **/s/_____**
                                        **CURTIS L. COLLIER**
                                        **UNITED STATES DISTRICT JUDGE**

32